IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| ERIC JOSEPH DEPAOLA,  )  | Civil Case No. 7:10cv00561 |
|     Plaintiff,  ) | |
|   ) | |
| v.  ) | |
|   ) | By: Robert S. Ballou |
|   ) | United States Magistrate Judge |
| LESLIE FLEMMING, et al.,  ) | |
|     Defendants.  ) | |

**REPORT AND RECOMMENDATION**

Eric Joseph DePaola, proceeding *pro se*, filed this civil rights action pursuant to 42 U.S.C. § 1983 with jurisdiction vested pursuant to 28 U.S.C. § 1343. DePaola alleges that the defendants violated his First Amendment rights by denying him access to certain publications. By Order dated October 13, 2011, the court referred all dispositive motions to the undersigned for proposed findings of fact and a recommended disposition of the case, pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, the undersigned finds that DePaola's allegations do not establish a constitutional violation and, therefore, **RECOMMENDS** that defendants' motions for summary judgment (Docket Nos. 23, 37, and 53) be **GRANTED**, DePaola's motions for summary judgment (Docket Nos. 49 and 62) be **DENIED**, and this action be **DISMISSED**.

**I.**

DePaola, a Virginia Department of Corrections ("VDOC") inmate incarcerated at Red Onion State Prison ("ROSP"), alleges that the defendants violated his First Amendment rights when they denied him possession of the following publications: Turning the Tide, Vol. 22, No. 3; Turning the Tide, Vol. 22, No. 4; Turning the Tide, Vol. 23, No. 2; Workers World, Vol. 51, No. 50; Workers World, Vol. 52, No. 35; Workers World, Vol. 52, No. 36; Wired, August 2010;

and A Jailhouse Lawyer's Handbook.[1]  DePaola seeks a permanent injunction ordering the defendants to allow him to receive these publications and to remove the publications from the VDOC Disapproved Publications List.  DePaola also seeks compensatory, punitive, and nominal damages.

VDOC administrators have the responsibility to maintain security, discipline, and good order in VDOC facilities.  Collins Apr. 18, 2011 Aff. ¶ 5.  This responsibility includes control of contraband, control over disruptive or illegal activities, and concern for the safety and well being of offenders and institutional staff.  Id.  VDOC Operating Procedure ("OP") 803.2 applies to publications which inmates may possess.  OP 803.2 excludes from VDOC facilities throughout the state any publication that contains material which promotes terror, violence, disorder, is sexually explicit, violates state or federal law, or threatens the safety and security of the institution.  Id.  At ROSP, defendant Major Flemming was responsible for reviewing the content

---

[1] DePaola also alleges that the defendants violated his First Amendment rights by listing various publications on the VDOC Disapproved Publications List.  Specifically he complains about: Prisons and Their Moral Influence on Prisoners, by Peter Kropotkin; Life in Prison, by Stanley Tookie Williams; The Autobiography of Malcolm X; The Coalition of Prisoners Rights Newsletter; Revolution Newspaper, Nos. 195, 197, 198, 199, 200, 201, 202, 203, 205, 206, 207, and 208; Workers World, Vol. 52, Nos. 9, 10, 11, 12, 13, 16, 17, 18, 19, 21, 22, 23, 24, and 32; The Sexual Experience, by Benjamin J.; Sadock, M.D., Harold Kaplin; Human Anatomy, by Martini, Timmons and Tallistch (2009); Pseudo Reality, by Anthony Rayson; Make Wudu and Salaah Like the Prophet, by Muhammad S. Adly; and M.I.M.: How to Fight Prison Censorship: A Guide for Prisoners.  However, DePaola does not allege that he ever requested any of these publications and defendants aver, and DePaola concedes, that none of these publications are currently on the VDOC Disapproved Publications List.  Accordingly, the undersigned finds that DePaola lacks standing to raise any claims as to these publications, Inmates v. Owens, 561 F.2d 560, 562-63 (4th Cir. 1977) (To state a cause of action under §1983, a plaintiff must allege facts indicating that plaintiff, himself, sustained deprivation of right, privilege, or immunity secured by the Constitution or laws of the United States.); Allen v. Wright, 468 U.S. 737, 751 (1984) (To demonstrate standing, plaintiff must allege personal injury fairly traceable to defendant's allegedly unlawful conduct and likely to be redressed by the relief requested.), and, furthermore, that his claims regarding these publications are now moot, Powell v. McCormack, 395 U.S. 486, 496 (1969) (When a claim no longer presents a viable legal issue to resolve, the claim becomes moot); Blanciak v. Allegheny Ludlum Co., 77 F.3d 690, 698-99 (3d Cir. 1996) (If developments occur during the course of a case which render the court unable to grant a party the relief requested, the claim(s) must be dismissed as moot.).  Therefore, the undersigned recommends that these claims be dismissed.  In addition, DePaola filed a motion to compel the defendants to provide him copies of these publications though discovery (Docket No. 64).  The defendants responded to DePaola's motion indicating that inasmuch as these publications are no longer banned, DePaola can order these publications himself.  DePaola argues that he cannot afford to pay for the publications.  Because the undersigned recommends that his claims regarding these publications be dismissed, the undersigned also recommends that DePaola's motion to compel also be **DISMISSED as moot**.

2

of incoming publications for compliance with OP 803.2.[2] L. Fleming Aff. ¶ 4. If Flemming determined that a publication did not meet or violated the requirements of OP 803.2, the requesting inmate was denied possession and the publication is sent to the Publication Review Committee ("PRC") for review.[3] Id. The PRC is charged with reviewing publications from VDOC facilities statewide to determine if any publication violates OP 803.2 and is appropriate for possession by an inmate in a VDOC facility. Collins Apr. 18, 2011 Aff. ¶ 6. The PRC reviews each publication issue-by-issue based on the criteria set forth in the OP to determine if the content promotes gang-affiliation, terror, violence, disorder, the violation of state or federal law, or if it contains sexually explicit acts, or has any content that threatens the safety and security of the institution. Id. Any publication that "reasonably" contains material that is in violation of the specific criteria for publication disapproval is not recommended for access into VDOC facilities. Id. The recommendation for or against any publication's access to the offender population is a decision that is made by the PRC as a whole. Id.

DePaola ordered each of the eight publications listed above.[4] Upon the arrival of each of the publications at ROSP, the publications were reviewed and determined to violate the OP. Accordingly, each publication was sent to the PRC for review. The PRC disapproved each of the publications. With regard to Turning the Tide, Vol. 22, Nos. 3 and 4, Vol. 22, No. 3, and Wired, August 2010, the PRC determined that the publications contained "material that promotes, advocates violence, disorder, insurrection or terrorists activities against individuals, groups or organizations, the government or any of its institutions."

---

[2] The undersigned notes that at the time of the alleged violations Fleming was a Major at ROSP and was responsible for these decisions. However, based on his affidavit, it appears that he no longer works in this position.
[3] Presumably, despite the fact that Fleming no longer performs this duty, the same procedure is still followed at ROSP, wit someone else making these determinations.
[4] The court notes that DePaola never actually ordered The Jailhouse Lawyer's Handbook. Rather, although he requested it, he was not allowed to order it because it was already on the VDOC Disapproved Publications list.

3

In particular, Turning the Tide, Vol. 22, No. 3, contains an article on the last page of the publication encouraging that the "seizure of State power, the taking of the means of production, and the total transformation to African Inter-communalism by the peoples' armed struggle is the true way to guarantee that the people survive instead of being exterminated." Furthermore, the author of the article is the Black Riders Liberation Party, a group affiliated with the Bloods and Crips which are known gangs. Collins July 22, 2011 Aff. ¶ 4. Turning the Tide, Vol. 22, No. 4 contains an article about anti-racist action. Within that article is a section titled "Cops and the Klan Work Hand in Hand!" This section describes nazis showing their faces in public places "because they know the armed bodies of state will have their backs." The section also suggests that "[w]e [the readers of the publication] need to make the agencies of state repression, which enforce some of the same relations of colonial exploitation and oppression as the explicit racists, pay a political price." The article depicts "state" authority as being in collusion with the nazis. Id. at ¶ 5. This issue also contains an article about police brutality being "as intense as ever throughout the nation, and resistance is even more important . . . ." Turning the Tide, Vol. 23, No. 2, discusses police officers killing members of the Black Panther party and stopping killer police. Leatherwood Aff. ¶ 5. The VDOC recognizes the Black Panther party as a gang. Id. Wired, August 2010, contains instructions for bomb making. Collins Apr. 18, 2011 Aff. ¶ 7(f). Defendants argue that the articles in these publications could promote violence, disorder and insurrection in the prison and threaten the security and orderly operation of the prison if inmates were permitted to have them.

With regard to all three issues of Workers World, the PRC determined that the publications contained "material written in code or written in a foreign (non-English) language" that was not obtained from an approved vendor. Specifically, each publication contains an

4

article on the last page which is entirely in a foreign language (Spanish) without a direct translation into English. Defendants argue that this presents a security concern for the VDOC because the article is not translated into English and prison officials do not know the content of the article. Furthermore, defendants argue that the VDOC does not have the resources to translate each article or publication which is written in a foreign language that comes into a facility. Collins July 22, 2011 Aff. ¶ 6.

Defendants do not explain why The Jailhouse Lawyer's Handbook was on the VDOC Disapproved Publications list. However, they state, and DePaola concedes, that the publication is no longer banned and that five copies are available to DePaola, and other inmates, in the ROSP library.

With the exception of The Jailhouse Lawyer's Handbook, DePaola grieved the PRC's denial of each publication and appealed to the highest level possible. At each level, his grievances were determined to be unfounded and the decision to ban each publication was upheld. Regarding The Jailhouse Lawyer's Handbook, DePaola voluntarily withdrew his first level grievance and did not pursue his claim further. Taylor Aff. ¶ 17 and attached grievances. DePaola then filed the instant civil rights action, the defendants moved for summary judgment, and DePaola filed cross-motions for summary judgment. Accordingly, this matter is now ripe for disposition.

## II.

DePaola alleges that the defendants violated his First Amendment rights by denying him access to The Jailhouse Lawyer's Handbook. Defendants raised the defense of non-exhaustion in their answer to DePaola's complaint and DePaola did not respond regarding exhaustion. Based on Fonnie Taylor's affidavit and the grievances submitted with the defendants' motion for

summary judgment, it is clear that DePaola did not fully exhaust his claim regarding The Jailhouse Lawyer's Handbook before filing this action. 42 U.S.C. § 1997e(a); see also, Dixon v. Page, 291 F.3d 485 (7th Cir. 2002), citing Perez v. Wisconsin Dep't of Corrections, 182 F.3d 532, 535 (7th Cir. 1999) (holding that an inmate's complaint must be dismissed for failure to exhaust even if the inmate demonstrates that he filed a grievance and appealed it to the highest level of the prison's grievance procedure after commencing the lawsuit). Further, DePaola's claims for injunctive relief as to this claim are moot because he now has access to The Jailhouse Lawyer's Handbook.[5] Powell v. McCormack, 395 U.S. 486, 496 (1969) (When a claim no longer presents a viable legal issue to resolve, the claim becomes moot); Blanciak v. Allegheny Ludlum Co., 77 F.3d 690, 698-99 (3d Cir. 1996) (If developments occur during the course of a case which render the court unable to grant a party the relief requested, the claim(s) must be dismissed as moot.). For all of these reasons, the undersigned recommends that DePaola's claim regarding the Jailhouse Lawyer's Handbook be dismissed.

### III.

DePaola alleges that the defendants denied him certain publications in violation of his First Amendment rights. Specifically, he alleges that he was denied Turning the Tide, Vol. 22, No. 3; Turning the Tide, Vol. 22, No. 4; Turning the Tide, Vol. 23, No. 2; Workers World, Vol. 51, No. 50; Workers World, Vol. 52, No. 35; Workers World, Vol. 52, No. 36; and Wired, August 2010. DePaola argues that by denying him these publications, the defendants have denied him access to information and ideas. The undersigned finds that DePaola's allegations regarding these remaining publications do not establish a constitutional violation. Accordingly, the undersigned recommends that defendants' motion for summary judgment be granted.

---

[5] In fact, the undersigned knows that DePaola has accessed the publication because DePaola mailed a copy of the publication to the court.

6

While prisoners do not forfeit all constitutional rights upon their imprisonment, Bell v. Wolfish, 441 U.S. 520, 545 (1979), incarceration necessarily limits a prisoners' privileges and rights, which "arises both from the fact of incarceration and from valid penological objectives- including deterrence of crime, rehabilitation of prisoners, and institutional security," O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (quoting Price v. Johnston, 334 U.S. 266, 285 (1948); citing Pell v. Procunier, 417 U.S. 817, 822 (1974); Procunier v. Martinez, 416 U.S. 396, 412 (1974)). Inmates "clearly retain protections afforded by the First Amendment"; however, inmates' First Amendment rights must be balanced with prisons' institutional needs of security, discipline, and general administration. O'Lone, 482 U.S. at 348-49. Thus, "a prison regulation that abridges inmates' constitutional rights is 'valid if it is reasonably related to legitimate penological interests.'" Lovelace v. Lee, 472 F.3d 174, 199 (4th Cir. 2006) (citing Turner v. Safley, 482 U.S. 78, 89 (1987)).

Whether a regulation is "reasonably related" to a legitimate penological interest depends on: (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates"; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns." Turner, 482 U.S. at 89-92; Lovelace, 472 F.3d at 200. The prisoner has the burden of proof to disprove the validity of a prison regulation pursuant to the Turner analysis. Overton v. Bazzetta, 539 U.S. 126, 132 (2003). The Supreme Court has also advised that when determining whether a prison regulation

7

is reasonable, courts "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Id. Further, the Supreme Court has repeatedly upheld prison regulations restricting prisoners' First Amendment rights. See, e.g., Beard v. Banks, 548 U.S. 521 (2006); Thornburgh v. Abbott, 490 U.S. 401 (1989); Turner, 482 U.S. 78; Bell, 441 U.S. 520.

In determining the first factor of the Turner analysis, the court considers (1) whether the connection between the regulation and the governmental interest is valid and rational and (2) whether the governmental interest is legitimate. Turner, 482 U.S. at 89 (quoting Block v. Rutherford, 468 U.S. 576, 586 (1984)). To meet these requirements, the connection cannot be "so remote as to render the policy arbitrary or irrational," and the governmental interest must be neutral, that is, without regard to the content of the expression. Id. at 89-90. The court recognizes that "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell, 441 U.S. at 547 (citing Jones v. N.C. Prisoners' Labor Union, 433 U.S. 119, 128 (1977); Procunier, 416 U.S. at 404-05; Cruz v. Beto, 405 U.S. 319, 321 (1972)); In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 469 (4th Cir. 1999). Defendants maintain that the publications at issue were denied based on prison security concerns. It is clear that prison administrators have a legitimate interest in maintaining safety and order within the institution. See Hodges v. Virginia, 871 F.Supp. 873, 876 (W.D. Va. 1994), rev'd on other grounds, Montcalm Publ. Corp. v. Beck, 80 F.3d 105 (4th Cir. 1996) (finding that security, discipline, order, public safety, and rehabilitation interests need no defense). Further, "[w]here .

8

. . prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the [regulation is] 'neutral'" as required under the first Turner factor. Thornburgh, 490 U.S. at 415-16. Based on the foregoing, the undersigned finds that the defendants have demonstrated a valid, rational connection between the VDOC's decision to deny access to the publications at issue and the legitimate governmental interest in preventing prison security issues and maintaining safety and order in the facility.

In considering the second Turner factor, the court notes that, even without access to the disapproved publications, DePaola retains alternative means of obtaining access to information and ideas through many other publications that the prison does allow him to receive. Thus, the availability of alternatives is not relevant if a penal regulation only limits rather than denies a constitutional right. Vester v. Rogers, 795 F.2d 1179, 1183 (4th Cir. 1986).

With regard to the third Turner factor, the undersigned finds that to allow the disapproved publications would increase the security risks at ROSP and unduly burden prison resources by requiring correctional officers and supervisors to address the security issues that may arise. Prison officials need not wait for a particular disruption to occur before they can take reasonable measures to abate it. See In re Long Term Admin. Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 470 (4th Cir. 1999). Rather, the Supreme Court has admonished that "[w]hen confronted with a threat to order, '[responsible prison officials must be permitted to take reasonable steps to forestall such a threat, and they must be permitted to act before the time when they can compile a dossier on the eve of a riot.'" Id. (second alteration in original) (quoting Jones, 433 U.S. at 132-33).

Finally, in considering the fourth Turner factor, the undersigned notes that DePaola does not advance any "obvious, easy alternative" and the undersigned can conceive of none.

9

Consequently, the undersigned finds that restricting DePaola's possession of the publications at issue does not violate his First Amendment rights because "responsible, experienced administrators have determined, in their sound discretion, that such [materials] will jeopardize the security of the facility." Block, 468 U.S. at 589. Therefore, the undersigned recommends that defendants' motions for summary judgment be granted.

## IV.

DePaola names the defendants in their personal capacities,[6] and the defendants assert the defense of qualified immunity. The undersigned finds that the defendants are entitled to qualified immunity as to DePaola's claims for damages and, therefore, recommends that defendants' motions for summary judgment be granted.

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity shields a government official from liability for civil monetary damages if the officer's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow, 457 U.S. at 818. Qualified immunity is an immunity from suit rather than a mere defense to liability. Thus, whether a defendant can claim qualified immunity is a pure question of law and is properly determined pretrial. Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (modified by Pearson v. Callahan, 555 U.S. 223 (2009) (permitting lower courts the discretion to determine which qualified immunity prong to analyze first)).

---

[6] To the extent DePaola sues the defendants in their official capacities for damages, neither a state nor its officials acting in their official capacities are "persons" for purposes of § 1983 damages actions and they are entitled to sovereign immunity. Sossamon v. Texas, 131 S. Ct. 1651, 1663 (2011); Will v. Michigan Dep't of State Police, 491 U.S. 58, 70-71, n.10 (1989).

10

In addressing qualified immunity, the United States Supreme Court has held that "a court must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all and, if so, proceed to determine whether that right was clearly established at the time of the alleged violation." Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000). Further, the Supreme Court held that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." Wilson, 526 U.S. at 609. If the court first determines that no right has been violated, the inquiry ends there "because government officials cannot have known of a right that does not exist." Porterfield v. Lott, 156 F.3d 563, 567 (4th Cir. 1998). As discussed above, DePaola has failed to present sufficient evidence to support his First Amendment claim. Accordingly, the undersigned finds that the defendants, in their personal capacities, are entitled to qualified immunity from suit and, therefore, recommends that defendants' motion for summary judgment be granted.

## V.

Further, the undersigned finds that the PRC is not a "person" for purposes of § 1983 and, therefore, recommends that all claims against the PRC be dismissed. To state a cause of action under § 1983, a plaintiff must allege facts indicating that plaintiff has been deprived of rights guaranteed by the Constitution or laws of the United States and that this deprivation resulted from conduct committed by a *person* acting under color of state law. West v. Atkins, 487 U.S. 42 (1988). As neither the VDOC nor its departments are "persons" subject to suit under § 1983, DePaola cannot maintain his action against the PRC. See McCoy v. Chesapeake Correctional

11

Center, 788 F. Supp. 890 (E.D. Va. 1992). Accordingly, the undersigned recommends that all claims against the PRC be dismissed.

## VI.

Based on the foregoing, the undersigned finds that DePaola's allegations do not establish a constitutional violation. Accordingly, the undersigned **RECOMMENDS** that that defendants' motions for summary judgment (Docket Nos. 23, 37, and 53) be **GRANTED**, DePaola's motions for summary judgment (Docket Nos. 49 and 62) be **DENIED**, and this action be **DISMISSED**.

The Clerk of the Court is directed immediately to transmit the record in this case to the Honorable Samuel G. Wilson, United States District Judge. Both sides are reminded that pursuant to Rule 72(b) they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

The Clerk of the Court is hereby directed to send copies of this Report and Recommendation to plaintiff and counsel of record for defendants.

        **Entered: November 16, 2011**

        */s/ Robert S. Ballou*

        Robert S. Ballou
        United States Magistrate Judge